**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Vernon Schaaf, Julian Boik,                              Civil No. 05-1319 (JNE/SRN)
and Alfred Streufert, on behalf
of themselves and
others similarly situated,

                    **Plaintiffs,**

                                                          **REPORT AND**
           v.                                             **RECOMMENDATION**

Residential Funding Corporation and
Heller Financial, Inc.,

                    **Defendants, and**

Marshall & Isley Bank,

                    **Nominal Defendant.**

_____

John A. Cochrane, Esq., and Vernon J. Vander Weide, Esq., on behalf of Plaintiffs

Andrew J. Holly, Esq., and James K. Langdon, Esq., on behalf of Defendant Residential
Funding Corporation

Larry D. Espel, Esq., and Monte A. Mills, Esq., on behalf of Defendant Heller Financial,
Inc.

_____

SUSAN RICHARD NELSON, United States Magistrate Judge

          The above-captioned matter comes before the undersigned on Defendants' Motion

to Dismiss and/or Strike (Doc. No. 33).  This matter has been referred to the undersigned

for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1.  For the

reasons set forth below, the Court recommends granting Defendants' motion and

dismissing all of Plaintiffs' claims for failure to state a claim upon which relief may be

granted.

1

I.    **BACKGROUND**

From November 1997 until November 1999, Plaintiffs and members of the class they seek to represent were solicited and allegedly induced by underwriter Miller & Schroeder Financial, Inc. (MSF) to purchase debentures[1] issued by United Homes, Inc. (UHI). (Compl. ¶ 1.)  On September 25, 1997, before the solicitation began, the Securities and Exchange Commission (SEC) told UHI to include a disclosure in the required  prospectus for its debentures stating whether UHI was in compliance with its loan agreements with UHI's primary lenders: Residential Funding Corporation (RFC) and Heller Financial, Inc. (Heller).  (Id. ¶ 409.)  On October 17, 1997, UHI informed the SEC that "[d]isclosure has been added to . . . the [p]rospectus indicating the amount of debt outstanding under the Heller Line and the [RFC] Line as well as the fact that [UHI] is in compliance with the terms of this indebtedness."  (Id. ¶ 410.)  On November 5 and 10, 1997, UHI informed Heller and RFC that UHI needed compliance certificates for their respective loan agreements.  (Id. ¶ 412.)  On November 14, 1997, the SEC declared effective the registration statement, including the prospectus, for the UHI debentures.  (Id. ¶ 19.)  That prospectus included a statement by UHI that it was "in compliance with the terms of the credit agreements governing [UHI's] indebtedness."  (Id. ¶ 32.)

On November 18, 1997, RFC sent a lender certificate to UHI and MSF in which RFC stated that it was "not aware of any facts that would reasonably give rise" to a concern that UHI would default on its existing loans with RFC.  (Id. ¶ 292-93.)  On the same day, Heller

---

[1] Debentures are investments in which the purchasers make a loan to the issuing company in exchange for the subsequent return of the principal amount with interest. (Id. ¶ 22.)

provided UHI and MSF with a similar lender certificate.  (Id. ¶ 168.)  Under the credit agreement between UHI and Heller, Heller's consent was required for UHI to sell the debentures at issue in this litigation.  (Id. ¶ 207.)  On November 19, 1997, UHI entered into an underwriting agreement with MSF, in which UHI was required to represent to MSF that UHI was not in default or breach of any loan agreement and that no fact existed "which, with giving of notice or lapse of time or both, would constitute such an event of default." (Id. ¶ 413.)

The offering of the UHI debentures commenced on November 25, 1997 and extended into 1998.  (Id. ¶ 418.)  From November 20 through December 24, 1997,  based solely upon oral representations made by MSF, the named Plaintiffs purchased the UHI debentures.  (Id. ¶¶ 23-25, 49.)  Only after Plaintiffs made their investment decisions, based on MSF's oral representations that the debentures were worthy investments, were they sent the written prospectus.  (Id. ¶ 49.)

UHI's debentures were to be repaid in installments from September 1999 through March 2005.  (Id. ¶ 22.)  In April 1998, Heller informed UHI that UHI was in default due to UHI's failure to comply with the reporting requirements contained in the UHI-Heller lending agreement.  (Id. ¶ 226.)  In November 1998, RFC declared UHI in default of its loan terms. (Id. ¶ 382.)  On March 9, 2000, UHI filed for bankruptcy.  (Id. ¶ 518.)  In November 2000, counsel for Plaintiffs filed an action in Minnesota state court captioned, First National Bank of the North Prairie, Prairie National Bank, and Centennial National Bank v. Miller and Schroeder Financial, Inc.  (Doc. No. 44 Ex. A.) The plaintiffs in that action sued MSF on behalf of a class of investors concerning the same debentures at issue in this case for negligence, negligent misrepresentation, and violations of the Minnesota Securities Act, the

3

Minnesota Consumer Fraud Act, and the federal Securities Act of 1933.  (Id. Ex. A.)  The

state trial court later denied those plaintiffs' attempt to certify the class (Doc. No. 50 Ex. E)

and the individual plaintiffs settled their dispute with MSF shortly thereafter.  MSF is now

also bankrupt.  (Id. ¶ 11).  According to Plaintiffs, Heller received "all, or virtually all, of the

net proceeds" of the debenture offering.  (Id. ¶ 545.)  Thus, Plaintiffs have no further

recourse against UHI or MSF for the, now, worthless debentures.  On June 10, 2005,

Plaintiffs commenced an action against RFC and Heller in Minnesota state court. (Doc. No.

1.)  Defendants removed the case to this Court on July 1, 2005.  (Id.)  Plaintiffs' 549-

paragraph Complaint is 116 pages in length, not including its appendix.  (See Doc. No. 1

Exs. A-1, A-2, and A-3.)

Plaintiffs allege that UHI and MSF represented to the SEC that UHI was in full

compliance with the loan covenants in its RFC and Heller loan agreements based upon

false representations made by RFC and Heller in the 1997 lender certificates provided to

MSF and UHI.  (Compl. ¶ 1.) Plaintiffs allege that Defendants' lender certificates were false

when forwarded to MSF and UHI on November 18, 1997.  (Doc. No. 59 at 5.)[2]  According

to Plaintiffs, "from September 30, 1996 through September 30, 1998, [UHI] "was in default

of the maximum debt/worth ratio allowed by Defendants' loan agreements, as well as other

covenants."  (Id.)  Plaintiffs allege that UHI issued its debentures to raise cash and

Defendants allowed UHI to do so subject to subordinating the debentures to their loans.

---

[2] On May 2, 2006, Plaintiffs filed with the Clerk of Court a seventy-nine page responsive brief using the Court's electronic case filing system.  (Doc. No. 59.)  That same day, the Court received a courtesy "copy" of Plaintiffs' brief which numbers fifty-one pages and contains different text on a number of pages.  Herein, the Court cites to the official version of the brief filed with the Clerk of Court.

(Id. at 6.)   Plaintiffs allege that the RFC and Heller certificate misrepresentations were repeated in the prospectus used to register UHI's debentures with the SEC and various states and to sell UHI's debentures to public investors.   (Id. at 9.)   According to Plaintiffs, MSF relied on RFC's and Heller's lender certificates in determining whether to underwrite UHI's debentures and, had MSF been aware that UHI was in violation of the RFC and Heller loan agreements, MSF would not have underwritten the debentures or would have conditioned its underwriting on UHI resolving the violations.   (Compl. ¶¶ 415-16.)   Plaintiffs specifically allege that "[a]s MSF's chief executive officer testified, MSF would not have sold these debentures if" MSF knew that "UHI's senior lenders were able to put UHI in default of their loans."   (Id. ¶ 414.)   According to Plaintiffs, after the sale of the debentures, Defendants stopped accommodating UHI.   (Doc. No. 59 at 8.)   "By letter dated April 22, 1998, Heller informed UHI that UHI was in default due to UHI's failure to comply with the . . . [quarterly reporting requirements] and other covenants" in its credit agreement with Heller.   (Compl. ¶ 226.)   Likewise, on "November 16, 1998, RFC informed UHI that UHI was in violation of the RFC debt/worth ratio."   (Id. ¶ 382.)

Plaintiffs allege that RFC and Heller materially participated in, aided and abetted, and assisted, MSF's and UHI's fraudulent and deceptive conduct by representing to UHI, MSF, the SEC and, indirectly through MSF and the UHI debenture prospectus, to prospective purchasers of the UHI debentures, that UHI was in compliance with the applicable loan agreements.   (Id. ¶¶ 2-3.)   Plaintiffs' Complaint contains three counts: Count I alleges that RFC and Heller violated the Minnesota Consumer Fraud Act (MCFA), the relevant provision of which is codified at Minn. Stat. §§ 8.31, 325F.69; Count II alleges that RFC and Heller committed common law fraud; and Count III alleges that Heller was

unjustly enriched by its conduct.  (Id. ¶¶ 519-49.)  As part of its statutory and common law

fraud counts, Plaintiffs also claim that RFC and Heller aided and abetted the fraud allegedly

perpetrated by UHI and MSF.  (Id. ¶¶ 527-28, 541-42.)  On pages five and six of their

Complaint, Plaintiffs state that they seek to represent:

> a class that includes all persons who purchased the Debentures in a public
> offering pursuant to a registration statement with the SEC and various states
> that began on November 25, 1997 and, based on MSF's practice of allowing
> purchasers to rescind their purchases and reselling the Debentures whose
> purchases were rescinded, continued thereafter until November 1999 . . . .

(Id. Part IV ¶ 14.)  Plaintiffs claim that there exist at least eight questions of law and fact

common to this class.  (Id. Part IV ¶ 15.)  Plaintiffs also allege eight reasons why the action

is properly maintained as a class action.  (Id. Part IV ¶ 16.)

Defendants now move to dismiss all of Plaintiffs' claims pursuant to Federal Rule

of Civil Procedure 12(b)(6), or, in the alternative, move to dismiss the class allegations set

forth on pages five and six of the Complaint on the grounds that Plaintiffs cannot establish

a maintainable class and finally seek to strike certain references in the Complaint  as

"immaterial and impertinent" allegations.  (Doc. No. 33.)

## II.   PARTIES' POSITIONS

### A.   Minnesota Consumer Fraud Act Claims Against RFC and Heller (Count 1)

Defendants attack Plaintiffs' statutory fraud count by arguing that: (1) the MCFA

applies only to ordinary consumer transactions concerning "merchandise," a term which is

defined under the MCFA as "any objects, wares, goods, commodities, intangibles, real

estate, loans, or services" and which the Minnesota Court of Appeals has determined does

not include securities such as debentures; (2) the MCFA is a private attorney general

statute and the Minnesota Supreme Court has determined that claims brought thereunder must demonstrate a benefit to the public, yet no public benefit is alleged by Plaintiffs; (3) no causal nexus exists between the fraud alleged and Plaintiffs' loss and this nexus is a required element of an MCFA claim; and (4) Plaintiffs' aiding and abetting claims fail because the Complaint fails to allege facts sufficient to show that RFC and Heller provided "substantial assistance" to UHI or MSF or acted in concert with UHI or MSF pursuant to a common scheme and such assistance is required to prove aiding and abetting.  (Doc. No. 39 at 5-8, 20-29; Doc. No. 42 at 10-15.)

## 1.    Whether Securities Are Covered by the MCFA

Defendants first contend that the Minnesota Court of Appeals, in Loop Corp. v. McIlroy, No. A04-362, 2004 WL 2221619, at *6 (Minn. Ct. App. Oct. 5, 2004), rev. denied (Minn. Dec. 22, 2004), confirmed that the term "merchandise," to which the MCFA exclusively applies, does not include securities such as debentures.  (Doc. No. 39 at 6.) Defendants also contend that courts have held that the consumer fraud statutes of other jurisdictions which are similar or nearly identical to the MCFA do not apply to securities. (Id. at 6-7.)  Finally, Defendants argue that Minnesota has enacted a separate legislative scheme, the Minnesota Securities Act, to cover securities fraud, which demonstrates that the legislature intended the MCFA to be limited to "ordinary consumer transactions."  (Id. at 5-7.)

Plaintiffs agree that the UHI debentures are securities but respond that the Loop case cited by Defendants is an unpublished Minnesota Court of Appeals case and that the Minnesota Supreme Court in Jenson v. Touche Ross & Co., 335 N.W.2d 720, 728 (Minn. 1983) determined that the investment contracts at issue were covered by the MCFA.  (Doc.

7

No. 59 at 13.)  At the motion hearing, Plaintiffs cited to <u>Force v. ITT Hartford Life and Annuity Insurance Co.</u>, 4 F. Supp. 2d 843 (D. Minn. 1998) and <u>Parkhill v. Minnesota Mutual Life Insurance Co.</u>, 995 F. Supp. 983 (D. Minn. 1998) for the proposition that life insurance policies marketed as investments were covered by the MCFA.  Plaintiffs also cite <u>Meyer v. Dygert</u>, 156 F. Supp. 2d 1081 (D. Minn. 2001) in support of their position, in which the court found the MCFA applicable to fraud involving junior mortgage notes and <u>State ex rel. Spannaus v. Coin Wholesalers, Inc.</u>, 250 N.W.2d 583, 584-85 (Minn. 1976) in which the State of Minnesota alleged violations of the false advertising provision of the MCFA against certain persons concerning the sale of securities.  (<u>Id.</u> at 13.)  Plaintiffs argue that the term "merchandise" is defined in the MCFA to include "intangibles" and "loans," terms they claim cover the debentures at issue here.  (<u>Id.</u> at 14.)  Specifically, Plaintiffs contend that the United States and Minnesota Supreme Courts have construed bonds and notes to be "intangible" personal property.  (<u>Id.</u> at 13.)  Plaintiffs further point to the consumer fraud protections provided to senior citizens under Minn. Stat. § 325F.71 which provides for damages for conduct prohibited by §§ 325F.68-.69 relating to sources of retirement assets; Plaintiffs proffer that "[r]etirement accounts are typically invested in securities."  (<u>Id.</u>)  In response to Defendants' argument that the existence of the Minnesota Securities Act is proof that the MCFA does not cover securities, Plaintiffs point to the remedies sections of both Acts which provide that the remedies provided thereunder are in addition to other remedies provided by law.  (<u>Id.</u> at 15-16 (citing §§ 8.31, subd. 3a; 80A.23, subd. 11. ))

Heller replies that the <u>Jenson</u> language cited by Plaintiffs is dictum because the issue before the <u>Jenson</u> court was whether the MCFA should be read to impose strict liability on an accounting firm to ensure that its audits did not contain misleading

8

statements—not how to interpret the word "merchandise." (Doc. No. 62 at 2.) RFC replies that the Jenson decision turned on the nature of the silver coin contracts at issue in that case, and the Jenson court "merely held that investment contracts of that nature were within the ambit of the [M]CFA; it did not purport to hold that securities sold on a public offering governed by the Minnesota Securities Act were also subject to the [M]CFA." (Doc. No. 64 at 3.) Heller argues that the Meyer decision simply followed the dictum in Jenson without analyzing the definition of "merchandise" under the MCFA. (Doc. No. 62 at 2 n.1.) RFC contends that Meyer found the mortgage notes at issue there to be intangibles but the case did not address debentures and, "in any event, was [decided] prior to the Loop decision." (Doc. No. 64 at 3.) RFC argues that the Loop decision "is the best indication of current Minnesota law on the subject," and, if there is any doubt, contends that the Court should certify the question to the Minnesota Supreme Court. (Id. at 3.) As further proof that the MCFA does not apply to securities, Heller notes that the legislature did include "securities" within the ambit of § 325F.67 which concerns false statements in advertising, but did not include the term "securities" within § 325F.68 and 69 which concerns the prevention of consumer fraud, demonstrating that the Minnesota Legislature expressly includes "securities" where it intends securities to be covered by a statute. (Doc. No. 62 at 2.) As to Plaintiffs' claim that securities are intangibles, Heller contends that the applicable definition of "general intangibles" is "any property . . . other than . . . instruments" (Doc. No. 62 at 2 (citing Minn. Stat. § 336.9-102(a)(42)) and argues that "instruments" are securities as defined under the Minnesota statutes (Id. (citing § 80A.14, subd. 18(a)). Plaintiff responded at the motion hearing that the definition of "general intangibles" used by Heller derives from Article 9 of the Uniform Commercial Code (UCC) which does not

9

apply to securities so it is not surprising that the definition would exclude securities which are instead covered under Article 8 of the UCC.

## 2.   <u>Whether Plaintiffs' Claims Are a Public Benefit</u>

In the second prong of its attack on Plaintiffs' MCFA claims, Heller argues that Plaintiffs must show that their claims are a benefit to the public because their claims can only be brought through the private attorney general statute, Minn. Stat. § 8.31, subd. 3a, which incorporates the MCFA.  (Doc. No. 39 at 7-8.)  Heller argues that Plaintiffs seek only compensatory damages for their investment losses as individual investors and, thus, their claims have no public benefit.  (<u>Id.</u> at 8.)  Heller cites three decisions from this District in support of its proposition—<u>Evangelical Lutheran Church in America Board of Pensions v. Spherion Pacific Workforce LLC</u>, Civ. No. 04-4791, 2005 WL 1041487, at *4 (D. Minn. May 4, 2005) (dismissing MCFA claims because there was no public benefit where "recovery is sought for the exclusive benefit of the plaintiff"); <u>Zutz v. Case Corp.</u>, Civ. No. 02-1776, 2003 WL 22848943, at *4 (D. Minn. Nov. 21, 2003) (dismissing MCFA claims seeking compensatory damages for the benefit of plaintiffs because there was no public benefit); <u>Pecarina v. Tokai Corp.</u>, Civ. No. 01-1655, 2002 WL 1023153, at *5 (D. Minn. May 20, 2002) (dismissing an MCFA claim because it did not benefit the public).

Plaintiffs respond that the UHI debentures were sold to the general public and the "essence of Plaintiffs' case is that [D]efendants 'rip[ped] off a large number of citizens,'" a type of fraud that Plaintiffs claim the private attorney general statute is intended to cover. (Doc. No. 59 at 19 (quoting <u>Ly v. Nystrom</u>, 615 N.W.2d 302, 314 n.21 (Minn. 2000)). Plaintiffs also argue that the cases cited by Heller are distinguishable because, in all three cases, the recovery sought was for the exclusive benefit of the plaintiff.  (<u>Id.</u>)  Plaintiffs

10

contend that their claims seek recovery on behalf of a class and seek a remedy for all of the debenture purchasers.  (Id.)  Plaintiffs also contend that MSF publicly advertised the debenture offering.  (Id. at 18 n.8.)  Plaintiffs contend that misrepresentations to the public invoke the private attorney general statute and cite Collins v. Minnesota School of Business, Inc., 655 N.W.2d 320 (Minn. 2003) in support of this argument.

Heller replies that, "like the plaintiffs in the Evangelical case," Plaintiffs here "confuse[ ] large numbers with the public benefit."  (Doc. No. 62 at 3 (citing Evangelical, 2005 WL 1041487, at *4.))  Heller contends further that, unlike the plaintiffs in the Collins case, Plaintiffs do not allege that the MSF advertisements cited by Plaintiffs contain misrepresentations, and Plaintiffs do allege that they "had only [the] oral representations [of MSF] to go on when they agreed to purchase" the debentures.  (Id. at 4.)  At best, Heller argues, Plaintiffs' MCFA claim is based on misrepresentations found in the prospectus and lender certificates which Plaintiffs received after they had become individual investors.  (Doc. No. 62 at 4.)  Heller cites to Davis v. U.S. Bancorp, 383 F.3d 761, 768 (8th Cir. 2004) and  Flora v. Firepond, Inc., 260 F. Supp. 2d 780, 788 (D. Minn. 2003), aff'd, 383 F.3d 745 (8th Cir. 2004), for the proposition that fraudulent representations in these direct communications to investors do not constitute communications to the public.  (Id.)  Heller argues that Davis and Flora require that the misrepresentations in question be to the public at large to be actionable under the MCFA.  (Id.)  At the motion hearing, Plaintiffs argued that the advertisements, while not misleading themselves, drew the public into the fraud.  Plaintiffs also argue that in promulgating Minnesota Rule 2875.3500, subp. 2, which requires the issuer of debentures to have sufficient funds to cover the interest on the offering, the Commissioner of the Minnesota Department of Commerce determined it is in

11

the public interest to offer creditworthy, fixed income investments because the statute authorizing the rule's promulgation, Minn. Stat. § 80A.25, subd. 2 requires rules promulgated thereunder to be necessary or appropriate to protecting the public interest. (Doc. No. 1 ¶¶ 452-462, Doc. No. 59 at 18.)

### 3.   Whether Plaintiffs Have Alleged Loss Causation

Defendants' third attack on Plaintiffs' MCFA claims focuses on loss causation—that an adequate causal nexus does not exist between the fraud alleged and Plaintiffs' economic loss. (Doc. No. 39 at 11-17; Doc. No. 42 at 10-13.) Heller argues that the United States Supreme Court, in Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), "confirmed that a plaintiff must plead (and prove) that the defendant's alleged misrepresentation proximately caused the plaintiff's economic loss." (Doc. No. 39 at 12.) Heller contends:

> While Dura involved claims under the federal securities fraud statutes, the Court observed that the common law also requires that a plaintiff prove proximate cause to establish a fraud claim. In Dura, the plaintiffs alleged that false representations about the likelihood of FDA approval for a new asthma spray device caused them to purchase stock at an artificially high price. The district court [in considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)] dismissed the complaint for failure to allege loss causation. The Ninth Circuit reversed the district court's dismissal, observing that " the injury occurs at the time of the transaction." The U.S. Supreme Court unanimously reversed the Ninth Circuit' s decision, finding that the economic loss occurs later, because "at the moment the transaction takes place, the plaintiff has suffered no loss."

(Id. at 12-13 (citing Dura, 544 U.S. at 339-45.)) Heller quotes a passage of the opinion in which the Dura Court describes a "tangle of factors" that might cause an economic loss:

> If the purchaser sells later after the truth makes its way into the market place, an initially inflated purchase price might mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier

misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. (The same is true in respect to a claim that a share's higher price is lower than it would otherwise have been-a claim we do not consider here.) Other things being equal, the longer the time between purchase and sale, the more likely that this is so, i.e., the more likely that other factors caused the loss.

(Id. (citing Dura, 544 U.S. at 342-43.))  Heller argues that the Dura opinion means "an inflated purchase price alone cannot be the proximate cause of the economic harm required for loss causation." (Id.)  Quoting Dura, Heller contends that Plaintiffs' Complaint "must 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" (Id.)  Heller contends that Plaintiffs have not alleged facts which, if true, would show that Plaintiffs' financial loss was connected to Defendants' alleged misrepresentations because Plaintiffs' loss "did not occur until years later, when [UHI] failed to make payments on the Debentures and then filed for bankruptcy in March 2000." (Id. at 14.)  Defendants also argue that, "the Complaint alleges that after 1997, '[UHI]'s Arizona activities' performed 'poorly' as a result of various factors, including 'zoning issues' and 'personnel issues.'" (Id.; Doc. No. 42 at 11-12 (citing Complaint ¶ 500.))  RFC argues that Plaintiffs' allegations concede that "[t]hese business failures (among others) caused [UHI] to lose revenue, and it stopped paying interest on the RFC loan in December 1998—over a year after RFC's initial letter." (Doc. No. 42 at 12 (citing Complaint ¶ 498.))

Heller further argues that: "Plaintiffs' alleged 'reliance' on 'MSF's implicit representation' that 'the Debentures were a meritorious investment,' (Compl. ¶ 435), [is] similar to [that of] the plaintiffs in Dura, who alleged 'reliance on the integrity of the market.' Dura, [544 U.S. at 340]." (Doc. No. 39 at 15.)  Heller continues:

13

> And, just as in <u>Dura</u>, such allegations are insufficient to plead proximate causation and economic loss.  Plaintiffs do not—and cannot—allege that Heller or RFC ever used facts available in November 1997 to declare [UHI] in default on the loans.  Heller's and RFC's letters, of course, did not guarantee that [UHI's] business would succeed.  In short, the letters were not the proximate cause of [UHI's] bankruptcy and Plaintiffs' economic loss.

(<u>Id.</u> at 15 (citing <u>Dura</u>, 544 U.S. at 342-43.))

Similarly, RFC cites <u>Mikwalk v Scura</u>, 691 F. Supp. 1218, 1222-23 (D. Minn. 1998); <u>LeSage v. Norwest Bank Calhoun-Isles, N.A.</u>, 409 N.W.2d 536 (Minn. Ct. App. 1987); and <u>Flynn v. American Home Products Corp.</u>, 627 N.W.2d 342, 350-52 (Minn. Ct. App. 2001) as examples of cases where loss causation has been determined to be a necessary element of an MCFA claim.  (Doc. No. 42 at 10.)  Heller cites to <u>Wiegand v. Walser Automotive Groups, Inc.</u>, 683 N.W.2d 807, 811 (Minn. 2004) for the same proposition. (Doc. No. 62 at 6.)  RFC contends that if the UHI debenture "investment failed for reasons other than the misrepresented facts, Plaintiffs do not raise a claim on which relief may be granted." (Doc. No. 42 at 10.)  RFC argues that the Complaint alleges that RFC and Heller made misrepresentations to MSF by issuing lender certificates that stated UHI was not or could not be in default.  (<u>Id.</u> at 11.)  RFC argues that Plaintiffs allege that RFC and Heller's fraud on MSF in turn acted as a fraud on members of the putative class because MSF would not have underwritten the UHI debentures but for the false lender certificates.  (<u>Id.</u>) RFC asserts that Plaintiffs do not allege that RFC declared a default based upon the facts known in November 1997 but, instead, the Complaint states that UHI defaulted approximately two years after the debentures issued.  (<u>Id.</u>)  RFC argues, "In the time between the November 1997 [lender certificate issuance] and [UHI]'s bankruptcy, the Complaint alleges that [UHI] was in compliance with RFC's loan covenants much of the

time.  Thus, the alleged ultimate fact RFC misrepresented—that it could have declared a

default—never caused Plaintiffs any harm."  (Id. (citation omitted.))

Plaintiffs concede that they must allege loss causation but contend that "Defendants'

view of loss causation is overly restrictive."  (Doc. No. 59 at 35.)  At oral argument, Plaintiffs

distinguished the Dura decision on the grounds that Dura was based on federal securities

law which Plaintiffs argue is more stringent in its causation requirements than Minnesota

law.  Plaintiffs also argue that, under the MCFA, a "loss is established if the loss is one that

'might be expected to follow from the fraud and from events that are reasonably

foreseeable.'"  Id. (quoting Specialized Tours, Inc. v. Hagen, 392 N.W.2d 520, 537 (Minn.

1986)).  Plaintiffs assert:

> Given that United's noncompliance under the Heller and RFC loan
> agreements went back to September 1996 and existed at the time the
> debentures were sold, the Specialized Tours test is satisfied: the
> worthlessness of the debentures certainly "might be expected to follow" if
> United could not comply with its senior lenders' loan agreements and if
> United was dependent upon that funding, which it was, to service the
> debentures. RFC's determination to stop lending to United was an event that
> was "reasonably foreseeable" at the time of the sales of debentures because
> of the then-existing defaults, which is why Miller would not have underwritten
> the debentures if Heller and RFC had been truthful about United's
> compliance with their loan agreements.

(Id. at 36-37.)

Plaintiffs contend that UHI was "in default of [Defendants'] loan agreements before,

during and after the offering."  (Id. at 27.)  According to Plaintiffs, "To avoid having to

disclose [UHI]'s default . . . in its 1998 annual report, [UHI] and RFC connived to

retroactively reset the debt/worth ratio so that [UHI] was no longer in default."  (Id. (citing

Compl. ¶ 278.))  Plaintiffs argue that even if the initial lender certificates were not

fraudulent, RFC and Heller later knew that UHI had incorrectly calculated its debt/worth

ratio prior to the issuance of the debentures and are liable to Plaintiffs for failure to correct their lender certificates. (Id. at 31-35.) Further, Plaintiffs submit that "Defendants' false certificates need not be the sole cause of Plaintiffs' injury" where their "fraudulent conduct concealed circumstances that bore on the ultimate loss." (Doc. No. 59 at 24 (citing In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005); Le Sage, 409 N.W.2d at 540.))

### 4.   Whether Plaintiffs' Aiding and Abetting Allegations Are Legally Sufficient

Defendants also contend that the aiding and abetting claim fails because the Complaint does not allege facts sufficient to show that RFC and Heller provided "substantial assistance" to UHI or MSF or acted in concert with UHI or MSF pursuant to a common scheme. (Doc. No. 39 at 17-20; Doc. No. 42 at 14-15.) Defendants contend that Plaintiffs' theory of their case is that Defendants "deliberately, knowingly, intentionally and willfully withheld" from MSF information about the status of UHI's credit line. (Doc. No. 39 at 18 (citing Compl. ¶¶ 177, 201, 371, 414, 416.)) Defendants argue that this theory "is completely at odds" with Plaintiffs' allegation that Defendants "substantially assisted" MSF in defrauding Plaintiffs. (Id.) Defendants also argue that Plaintiffs' allegations show that Plaintiffs made their initial investment decisions based solely on oral representations made by MSF, not Defendants. (Id. at 19.) Finally, Defendants argue that they could not have "substantially assisted" MSF because the prospectus had already been approved by the SEC when Defendants provided their lender certificates. (Id.)

Plaintiffs respond that Defendants' omissions can provide a proper basis for aider and abettor liability where the plaintiff demonstrates that the defendant consciously

intended to assist in the perpetration of the fraud.  (Doc. No. 59 at 41 (citing <u>Metge v.</u> <u>Baehler</u>, 762 F.2d 621, 626-28 (8th Cir. 1985), <u>cert. denied</u>, 474 U.S. 1057 (1986)).

Plaintiffs contend that Defendants intended their certificates to influence MSF in determining whether to underwrite the debentures, and investors purchased the debentures in transactions that Defendants intended to influence.  (<u>Id.</u> at 45.)  Plaintiffs argue that, "[w]here the defendant's knowledge is substantial, the assistance need not be substantial to establish aiding and abetting liability."  (<u>Id.</u> (citing cases.))

Heller replies in part that its letter could not have substantially assisted in MSF's fraud because Heller's lender certificate was consistent with the prospectus and that, while its

> letter may have been necessary for [MSF]'s fraud . . . it was not sufficient. The Prospectus already disclosed all of [UHI]'s financial information.  Heller only provided one piece of information in its letter—confirmation from Heller that [UHI] was not in default.  Such minor conduct cannot constitute substantial assistance to [MSF]'s conduct.

(Doc. No. 62 at 9.)  At the motion hearing, Plaintiffs argued that Heller aided and abetted MSF and UHI's fraud by remaining silent despite knowing their lender certificate representations were false.

### B.    Common Law Fraud Claims Against RFC and Heller (Count 2)

Defendants argue that Plaintiffs' common law fraud claims must be dismissed because: (1) an inadequate causal nexus exists between the fraud alleged and Plaintiffs' loss; (2) the aiding and abetting claims fail because the Complaint fails to allege facts sufficient to show that RFC and Heller provided "substantial assistance" to UHI or MSF or acted in concert with UHI or MSF pursuant to a common scheme; and (3) Plaintiffs fail to allege facts sufficient to show actual reliance on Defendants' lender certificates.  (Doc. Nos.

17

39, 42.)   The first two of Defendants' arguments and Plaintiffs' responses to those arguments, are not substantially different from these same arguments raised in support of dismissing Plaintiffs' MCFA claims.   Therefore, the Court will here only address Defendants' third argument that Plaintiffs fail to allege facts sufficient to show actual reliance on Defendants' lender certificate representations.

Defendants contend that detrimental reliance is a necessary element of a common law fraud claim not met by Plaintiffs' allegations.  (Doc. No. 39 at 8-11; Doc. No. 42 at 13-14.)  According to Defendants, Minnesota law requires "actual reliance," not just reliance based upon a defendant's creation of a market for goods.  (Doc. No. 42 at 14 (citing Flynn v. Am. Home Prods. Corp., 627 N.W.2d 342, 350-52 (Minn. Ct. App. 2001)) and Doc. No. 39 at 9 (citing In re Digi Int'l, Inc. Sec. Litig., 6 F. Supp. 2d 1089, 1104 (D. Minn. 1998), aff'd, Nos. 00-3162, 00-3227, 14 Fed. Appx. 714 (8th Cir. Jul 05, 2001) and other cases.)) Defendants concede that the Complaint contains the conclusory allegation that Plaintiffs "justifiably relied upon each of RFC's and Heller's Certificates by purchasing UHI's debentures from MSF without being told about UHI's past and existing violations of the Heller Credit Agreement and the RFC Loan Agreements . . . or of the other adverse material facts known to Heller and RFC but not known to MSF and [P]laintiffs."  (Doc. No. 39 at 9 (quoting Compl. ¶ 532.))  RFC, however, contends that Plaintiffs admit that they never, in fact, relied on RFC's certificate.  (Id. at 14.)  RFC cites to Plaintiffs' allegation that, "In relying on MSF's due diligence and determination to underwrite the Debentures in connection with their purchases of the Debentures, [P]laintiffs . . . indirectly relied on the representations made by Heller and RFC to MSF that UHI was in compliance with the Heller and RFC loan agreements."  (Id. (citing Compl. ¶ 436.))  Heller argues further that

18

"the sequence of facts alleged in the Complaint make it impossible for Plaintiffs to prove actual reliance."  (Doc. No. 39 at 9.)  Heller cites to the forty-ninth numbered paragraph of the Complaint where Plaintiffs allege: "MSF sold the Debentures in a deceptive manner when it orally described the Debentures as worthy investments for investors seeking income investments and then, after the investors made their decision to invest, sending a prospectus that belied the oral representations."  (Id. at 9.)  Heller argues:

> [s]ince the Prospectus became effective before Heller and RFC provided their letters, by definition, those letters could not have been the basis for any statement in the Prospectus.  Moreover, Plaintiffs did not receive the Prospectus until after they invested in the Debentures and thus they could not have relied on any statements in the Prospectus to make their investment decisions.

(Id. at 9-10.)  While Heller concedes that "[s]ome court decisions uphold fraud claims on the basis of indirect representations made by a tortfeasor to a plaintiff through a third party," Heller argues that in those cases, "the representation actually passed from defendants to a third party and then to plaintiffs."  (Id. at 11 n.7 (citing as examples Vikse v. Flaby, 316 N.W.2d 276, 284 (Minn. 1982) and Kronebusch v. MVBA Harvestore Sys., 488 N.W.2d 490, 496 (Minn. Ct. App. 1992))).  Defendants contend the Complaint contains no allegations that the lender certification representations ever passed through MSF to Plaintiffs.

Plaintiffs do not contest Defendants' argument that Defendants did not make direct misrepresentations to Plaintiffs and concede that they received the prospectus after they decided to invest (see Doc. No. 59 at 22).  Plaintiffs argue instead that indirect misrepresentations can be sufficient to meet the detrimental reliance element of common law fraud, as Heller concedes.  (Doc. No. 59 at 20-24.)  Moreover, Plaintiffs allege that UHI

requested the lender certificates from RFC and Heller on November 5 and 10, 1997 and those certificates were delivered to MSF <u>before</u> MSF executed the underwriting agreement for the UHI debentures.  (Compl. ¶¶ 412-13.)  Additionally, the Complaint alleges that the prospectuses that were delivered to debenture purchasers were delivered <u>after</u> MSF had received RFC's and Heller's lender certificates and that MSF would not have proceeded with the sales had Defendants informed MSF of UHI's true creditworthiness.  (<u>Id.</u> ¶¶ 171-72, 294-96, 414-25.)  Plaintiffs also assert that they allege in the Complaint that MSF and UHI had a continuing obligation under the Securities Act of 1993 to amend the debenture registration statement to include any information regarding UHI's default or potential default and would have filed a corrective registration statement if RFC and Heller had been truthful in their November 18, 1997 lender certificates.  (<u>Id.</u> at 20-27.)  In other words, UHI and MSF were simply seeking Defendants' assurance that their representation to the SEC about UHI's indebtedness made prior to receiving the lender certificates was truthful or they would have had to inform the SEC otherwise.  (<u>Id.</u>)  Plaintiffs contend that they reasonably relied on MSF's due diligence as the underwriter of the UHI debentures who in turn relied on Defendants' lender certificate representations.  (<u>Id.</u>)  Plaintiffs argue that Defendants should not be able to exploit MSF's failure to comply with SEC regulations which require a prospectus to be delivered to interested purchasers at least forty-eight hours before a sale of the securities described in the prospectus.  (<u>Id.</u>)  Finally, Plaintiffs argue that their reliance may be presumed because, had the respondents received information about the true financial state of the company, they might have reconsidered their decisions to purchase the corporate notes.  (<u>Id.</u> at 25-27.)

Heller replies that the Complaint contains "no factual allegations that [MSF] told

Plaintiffs about Heller's [lender certificate]." (Doc. No. 62 at 7.) Therefore, Defendants' actual representations are not alleged to have passed from Defendants to third parties and then to Plaintiffs. (Id.) Heller further contends that Plaintiffs' reliance on MSF as the underwriter does not automatically extend to Defendants because MSF was independently aware of UHI's financial condition. (Id.) Finally, Heller represents that the <u>Viske</u> case cited by Plaintiffs does not contain the words "presumption" or "presume." (Id. at 7 n.6.) Heller argues that while there may be a presumption of reliance where violations of the Securities and Exchange Act are alleged based on some fraud-on-the market theory, Plaintiffs have brought no claims based on securities statutes and, in any case, there was no well-developed market for the UHI debentures as expressly stated in the prospectus. (Id. at 8.)

## C.    Unjust Enrichment, Disgorgement, Restitution Against Heller (Count 3)

Plaintiff claims Heller was unjustly enriched by its participation in the above alleged fraud and that Heller's profits should be disgorged as restitution for its actions. (Compl. ¶¶ 543-49.) Heller moves to dismiss these claims because it argues the claims rest on Plaintiffs' statutory and common law fraud claims which fail as a matter of law for the reasons argued in support of dismissal of each of those individual claims. (Doc. No. 39 at 22-24.) Heller contends that unjust enrichment "requires proof that the enrichment was unjust in the sense that the term would mean "'illegally or unlawfully.'" (Id. at 23 (quoting <u>Mon-Ray, Inc. v. Granite Re, Inc.</u>, 677 N.W.2d 434, 440 (Minn. Ct. App. 2004)). According to Heller, because Plaintiffs' statutory and common law fraud claims fail, Plaintiffs cannot show unlawful or illegal conduct by Heller. (Id.) Likewise, Heller argues that "[d]isgorgement is not an appropriate remedy" because Plaintiffs "do not have a valid claim[

] for damages."  (Id. (citing Montana v. Crow Tribe of Indians, 523 U.S. 696, 718 (1998)).

Finally, Heller argues restitution is unavailable "as a remedy because Plaintiffs cannot

establish Heller's liability on the substantive claims for violation of" the statutory or common

law fraud claims.  (Id. (citing Gatz v. Frank M. Langenfeld and Sons Const., Inc., 356

N.W.2d 716, 718 (Minn. Ct. App. 1984)).

Plaintiffs counter that: (1) the fraud claims should prevail for the reasons it has set

forth in defense of those claims; and (2) unjust enrichment, disgorgement, and restitution

are claims which stand or fall independent of their fraud claims because unjust enrichment,

disgorgement, and restitution are designed to rectify any unfair advantage or

unconscionable conduct such as that alleged in their Complaint.  (Doc. No. 59 at 48-50.)

Thus, Plaintiffs contend that they are entitled to damages under a theory of unjust

enrichment even if their other claims fail to state grounds upon which relief may be granted.

At the motion hearing, Heller conceded that it received the money Plaintiffs seek to

disgorge but argued that the business failed one and half years later so no causal

connection exists between their receiving the money and the failure of the business.

### D.   **Alternative Relief Requested**

As alternative relief to outright dismissal of Plaintiffs' claims, Defendants seek

a court order striking the class action allegations because they argue that: (1) in a prior

state court action, the trial court refused to certify the same claims and that refusal is

preclusive of the issue; and (2) Plaintiffs' claims present various individual questions of

liability that preclude class certification under Federal Rule Civil Procedure 23(b)(3).  (Doc.

No. 39 at 24; Doc. No. 42 at 15-21.)

Plaintiffs respond that they are not collaterally estopped from seeking class

22

certification because (1) the issues are not identical because the state court litigation did not address (a) a claim for disgorgement, (b) how the § 8.31 public benefit requirement affects class certification, (c) the similarity of oral representations that were not inconsistent with the prospectus, (d) the inconsequential effect of reliance on a class under the MCFA, (e) omissions and the presumption of reliance or fraud on the regulatory process on which Plaintiffs relied, and (f) MSF's deceptive practice of delivering the prospectus after the debenture sales were made; (2) no full and fair opportunity to be heard occurred at the state level because the matter settled after an interlocutory appeal of the class certification denial occurred; and (3) the settlement of the litigation is not binding on anyone other than the named plaintiffs in the state action because: no determination was made as to the fairness of the settlement on the class and no notice was given to the class of the settlement.  (Doc. No. 59 at 51-55.)  Plaintiffs also argue that individual issues do not predominate because: (1) the core fraud in the action involves broadly distributed disclosure documents disseminated to the public; (2) Defendants have not shown that any conflicts of law exist; (3) the remedies of unjust enrichment, disgorgement, and restitution implicate a limited fund which mandates a class under Federal Rule of Civil Procedure 23(b)(1)(B); (4) common law fraud is a common question or does not predominate because MSF's oral representations were uniform and MSF's brokers read UHI's prospectus before making the representations; and (5) causation is common and straightforward as to the proposed class of plaintiffs.  (Id. at 55-78.)

## III.   DISCUSSION

In considering a Rule 12(b)(6) motion, the Court assumes all facts alleged in the complaint are true.  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).  All reasonable

23

inferences from the complaint must be drawn in favor of the nonmoving party.  Hafley v. Lohman, 90 F.3d 264, 266 (8th Cir. 1996), cert. denied, 519 U.S. 1149 (1997).  Dismissal is appropriate only if "it appears beyond a doubt that the plaintiff can prove no set of facts which would entitle the plaintiff to relief."  Coleman v. Watt, 40 F.3d 255, 258 (8th. Cir. 1994).   Although "the complaint must contain sufficient facts, as opposed to mere conclusions, to satisfy the legal requirements of the claim to avoid dismissal," DuBois v. Ford Motor Credit Co., 276 F.3d 1019, 1022 (8th Cir. 2002), a court may dismiss "only if it is clear that no relief can be granted under any set of facts that could be proved consistent with the allegations."  Hishon, 467 U.S. at 73.  With the above standard in mind, the Court now turns to an analysis of each of Plaintiffs' counts as alleged in their Complaint.

### A.   Plaintiffs' Claims Fail Because They Fail to Adequately Plead Loss Causation

To show a violation of the MCFA: "(1) there must be an intentional misrepresentation relating to the sale of merchandise, and (2) the misrepresentation must have caused damage to the plaintiff."  Wiegand v. Walser Auto. Groups, Inc., 670 N.W.2d 449, 452 (Minn. Ct. App. 2003) (citing Group Health Plan, Inc. v. Philip Morris, Inc., 621 N.W.2d 2, 12 (Minn.2001)), rev'd on other grounds, 683 N.W.2d 807 (Minn. 2004).

A claim for fraud (also known as intentional misrepresentation) has five elements:

(1) there was a false representation by a party of a past or existing material fact susceptible of knowledge;
(2) made with knowledge of the falsity of the representation or made of the party's own knowledge without knowing whether it was true or false;
(3) with the intention to induce another to act in reliance thereon;
(4) that the representation caused the other party to act in reliance thereon; and
(5) that the party suffer pecuniary damage as a result of the reliance.

Specialized Tours, 392 N.W.2d at 532.  The fourth element is also called transaction

24

causation.    "Transaction causation is established when the plaintiff shows that the defendant's fraudulent conduct caused the plaintiff to engage in the transaction in question. This is nothing more than 'but for' causation, which is merely another way of describing reliance."  Harris v. Union Elec. Co., 787 F.2d 355, 366 (8th Cir. 1986), cert. denied, 479 U.S. 823 (1986); see also Specialized Tours, 392 N.W.2d at 538 ("[T]ransaction causation [exists where] the violation caused the plaintiff to engage in the transaction in question[.]"). "Courts often label the fifth element 'loss causation' in the context of investments." Spiegel v. Besikof, No. C4-95-958, 1995 WL 697559, at *3 (Minn. Ct. App. Nov. 28, 1995), rev. denied (Jan. 25, 1996). "[L]oss causation [exists where] the misrepresentation or omission caused the economic harm." Specialized Tours, 392 N.W.2d at 538.

In an action sounding in fraud, "the aggrieved party must show not only detrimental reliance on the false representation or omission, but also that the false representation or omission caused the economic harm"—loss causation.    Zacharias v. Polinsky, No. C3-03-304, 2003 WL 21694591, at *1 (Minn. Ct. App. 2003) (citing Specialized Tours, 392 N.W.2d at 538).  An allegation that a plaintiff would not have invested in a security had he been aware of certain misrepresentations or omitted facts is transaction causation, not loss causation. Zacharias, 2003 WL 21694591, at *2.

The Court finds that Plaintiffs' complaint fails to state a claim upon which relief may be granted because plaintiff fails to demonstrate an adequate causal nexus between the underlying fraud alleged and Plaintiffs' economic loss.  Plaintiffs concede that they must show some loss causation to succeed on their claims.  (Doc. No. 59 at 35.)  As in Dura, where the underlying trial court also ruled on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), to survive Defendants' motion to dismiss based on failure to

adequately allege loss causation, Plaintiffs must have set forth sufficient factual allegations in their Complaint that Defendants' 1997 letters caused their investment losses.  The <u>Dura</u> Court recognized that, "[o]ther things being equal, the longer the time between the purchase and sale, the more likely that . . . other factors" such as "changed economic circumstances . . . new industry-specific or firm-specific facts, conditions, or other events . . . taken separately or together account for some or all" of the loss alleged.  544 U.S. at 343.  The Court does not find persuasive Plaintiffs' argument that <u>Dura</u>'s analysis of loss causation should be less stringently applied when considering Plaintiffs' state law claims because the <u>Dura</u> Court was addressing a question of federal securities law.  "This is a distinction without a difference.  <u>Dura</u> stands for the proposition that the allegations, 'I paid an inflated price' or 'I would not have acted in the same way if I had known the truth' are insufficient without [causally related] actual economic loss."  <u>Carey v. Select Comfort Corp.</u>, No. 27CV 04-015451, 2006 WL 871619, at *3 (Minn. Dist. Ct. Jan. 30, 2006).  Quoting Prosser on Torts, the Minnesota Supreme Court in <u>Specialized Tours</u>, stated: "[I]f false statements are made in connection with the sale of corporate stock, losses due to a subsequent decline in the market . . . or other factors in no way relate[d] to the representations will not afford any basis for recovery."  392 N.W.2d at 537.

In this case, Plaintiffs do not allege that they suffered an economic loss at the time they purchased the debentures in November and December of 1997 (Complaint ¶¶ 23-25, 49).  In April 1998, Heller informed UHI it was in default and in November 1998, RFC informed Heller it was in default.  (<u>Id.</u> ¶¶ 226, 382.)  Plaintiffs do not allege that Defendants' actual default determinations were based on facts available to Defendants when their lender certificates issued.  UHI did not enter bankruptcy until March 9, 2000 (<u>Id.</u> ¶ 518),

26

more than two years after Defendants made their alleged misrepresentations.  In light of the length of time between the alleged misrepresentations and given the lack of factual allegations linking Plaintiffs' loss and Defendants' lender certificate representations and the likelihood of intervening factors which contributed to the loss, the Court finds that Plaintiffs do not state claims upon which relief may be granted.  See Dura, 544 U.S. at 343 ("[T]he longer the time between purchase and sale, the more likely that . . . other factors caused the loss.")  While it is possible that Defendants' lender certificates might have "touched upon" Plaintiffs' loss, "[t]o 'touch upon' a loss is not to cause a loss, and it is the latter that the law requires."  Id.

Similarly, Plaintiffs' claims that Defendants aided and abetted MSF and UHI in committing violations of the MCFA and common law fraud (Compl. ¶¶ 527-28, 541-42) fail because Plaintiffs fail to alleged facts sufficient to prove loss causation.  Even assuming that there exists transactional causation between MSF and UHI's misrepresentations and Plaintiffs' decision to invest in the debentures (i.e., that Plaintiff relied on the misrepresentations in making their investment decisions), Plaintiffs cannot show, based on the allegations in their Complaint, that MSF's or UHI's fraud in inducing them to buy the debentures caused their economic loss for the same reasons given above.

Similarly, Plaintiffs' unjust enrichment claim fails because Plaintiffs have not shown a sufficient nexus between the loss resulting from the alleged wrongful conduct and Defendants' lender certificates.  The Court also concurs with Defendants that Plaintiffs' statutory and common law fraud claims fail because Plaintiffs cannot show unlawful or illegal conduct by Defendants.  The unjust conduct alleged must be conduct approximating or equivalent to illegal behavior, see Mon-Ray, Inc., 677 N.W.2d at 440, and without valid

27

fraud claims, Defendants' conduct does not cross that threshold. Plaintiffs' disgorgement and restitution claims fail for similar reasons. See Montana v. Crow Tribe of Indians, 523 U.S. 696, 718 (1998); Gatz v. Frank M. Langenfeld and Sons Const., Inc., 356 N.W.2d 716, 718 (Minn. Ct. App. 1984).

### B. Plaintiffs' MCFA Claim Also Fails Because Plaintiffs' Lawsuit Lacks a Public Benefit

The MCFA, the relevant provision of which is codified at Minn. Stat. § 325F.69, provides:

> The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

Minnesota's private attorney general statute provides in part: "In addition to the remedies otherwise provided by law, any person injured by a violation of [the MCFA] may bring a civil action and recover damages, together with costs and disbursements, including costs of investigation and reasonable attorney's fees, and receive other equitable relief as determined by the court." Minn. Stat. § 8.31, subd. 3a.

> [T]he sweep of the [private attorney general] statute can be no broader than the source of its authority—that of the attorney general—whose duties are to protect public rights in the interest of the state. Conversely, it is not the responsibility of the attorney general to protect private or individual interests independent of a public purpose.

Ly v. Nystrom, 615 N.W.2d 302, 313 (Minn. 2000). "The class of plaintiffs under the private attorney general statute would be limitless if [courts] assumed that one individual's negative experience with a company was necessarily duplicated for every other individual and on that basis treated personal claims as benefitting the public." Davis, 383 F.3d at 768.

Even assuming Plaintiffs are correct and the MCFA applies to securities like the debentures at issue, Plaintiffs fail to set forth a legally sufficient MCFA claim because they do not allege facts, that, if true, would show that their lawsuit is brought to secure a public benefit.  "To determine whether a lawsuit is brought for the public benefit the Court must examine not only the form of the alleged misrepresentation, but also the relief sought by the plaintiff."  <u>Evangelical</u>, 2005 WL 1041487, at *4.  Plaintiffs' argument that a public benefit derives from their lawsuit because they seek to represent all purchasers of the UHI dentures (<u>see</u> Doc. No. 59 at 19) is not a sufficient factual allegation to survive a motion to dismiss.  In <u>Evangelical</u>, the plaintiff pension board argued that the fraud afflicted on it affected not only Evangelical, but also the tens of thousands of people who benefitted from its pension plans and the millions of Evangelical members who could potentially have benefitted from Evangelical's plans. 2005 WL 1041487, at *4.  The <u>Evangelical</u> court stated that Evangelical "confuses large numbers with the public benefit.  Evangelical is undisputedly a private organization, and any remedies sought in this case will enure solely to Evangelical."  <u>Id.</u>  Here, unlike the plaintiff in <u>Evangelical</u>, Plaintiffs seek to pursue relief on behalf of a number of investors.  But, ultimately, the benefit that will result, if they succeed, will accrue to the exclusive benefit of those individual investors because the "redress" sought "is to compensate Plaintiffs for their injuries."  <u>Pecarina v. Tokai Corp.</u>, Civ. No. 01-1655 ADM/AJB, 2002 WL 1023153, at *5 (D. Minn. May 20, 2002) (dismissing, pursuant to Rule 12(b)(6), a MCFA claim brought by the parents of children burned when using a product without a child-safety mechanism because, despite the parents' claims that the injuries resulted from a transaction between a large manufacturer and retailer and members of the consuming public involving fraud and false advertising, "the essence of [the

29

p]laintiffs' lawsuit [was] personal injury, involving allegations of negligence and products liability").

Finally, Plaintiffs' attempt to revive their MCFA claim by alleging the public was drawn into their debenture purchase through MSF's advertising of the debentures to the public also fails.   Plaintiffs do not contend that Defendants developed or paid for the advertisements; they were MSF advertisements.   More importantly, Plaintiffs do not contend that the advertisements contained misrepresentations.  As noted by Defendants, in the Collins case cited by Plaintiffs, the misrepresentations at issue were contained in advertisements to the public.   See Davis, 383 F.3d at 768 (noting that "because the misrepresentations [in Collins] . . . were made to the public at large in a television advertisement, successful prosecution of the claims would . . . benefit the public"); Flora, 260 F. Supp. 2d at 788 ("In Collins, because the fraud occurred in advertising that reached out to the public generally, the Court found that a private action would benefit the public.") Finally, Plaintiffs do not allege that the oral misrepresentations made to them prior to the purchase made any mention of Defendants' lender certificates or any other misrepresentations made by Defendants.  On these facts, Plaintiffs' suit is not one brought to "protect public rights in the interest of the state," Ly, 615 N.W.2d at 313, and they are not acting as private attorney generals.[3]  Thus, they cannot succeed on their MCFA claims

---

[3] Furthermore, while the Commissioner of the Minnesota Department of Commerce may have determined it is in the "public interest" to offer creditworthy, fixed income investments and, thus, promulgated Minnesota Rule 2875.3500, subp. 2, this rule, alone, is not sufficient to convert Plaintiffs' lawsuit—which is otherwise brought on behalf of private plaintiffs to redress their private losses and which is not brought under or to enforce Rule 2875.3500—into an action brought to protect public rights in the interest of the state.

as a matter of law.

**C.**     **Plaintiffs' Common Law Fraud Claim Also Fails Because Plaintiffs Fail to Allege Reliance**

"[C]ommon-law fraud . . . . require[s] <u>actual</u> reliance."  <u>In re Digi</u>, 6 F. Supp. 2d at 1104.  It is not necessary for the person relying on the misrepresentation to have personal contact with the person against whom suit is brought.  <u>See</u> <u>Vikse</u>, 316 N.W.2d at 284.  For purposes of this motion the Court accepts as true Plaintiffs' allegations that the lender certificates contained misrepresentations.  Plaintiff summarizes its reliance allegations as follows:

> Here, Defendants' representations to [UHI] and [MSF], which confirmed [UHI]'s and [MSF]'s representation to the SEC and in the prospectus, without which representations the SEC would not have cleared the prospectus and [MSF] would not have underwritten the debentures, establish the causal nexus required by the CFA.  Also, Plaintiffs relied on [MSF] to do its job to ascertain the merits of the debentures, and [MSF] in turn relied on Defendants' certificates.  Finally, Defendants' representations supplied the basis for the statement in the prospectus sent to Plaintiffs that [UHI] was in compliance.

(Doc. No. 59 at 20 n.9.)  While a fraud claim may be maintained where a third party passes along a misrepresentation made by a defendant, to survive a motion to dismiss, the plaintiff must set forth legally sufficient factual allegations that the defendant's misrepresentation actually reached the plaintiff and that he relied on the defendant's misrepresentation in going forward with the transaction.  <u>See</u> <u>Vikse</u>, 316 N.W.2d at 284 (finding actionable fraud where an independent contractor passed along false information about the finances of a company given to the contractor by defendants where they "knew and intended that [the contractor] would be passing on [the false] information to potential investors").   For example, in <u>Kronebusch v. MVBA Harvestore Sys.</u> the Minnesota Court of Appeals upheld

a challenge to a jury instruction on "indirect representations" after the defendant manufacturer had been found liable for fraud because the manufacturer's specific misrepresentations concerning the performance of silos was passed onto farmer purchasers by a silo dealer.  488 N.W.2d 490, 496 (Minn. Ct. App. 1992), rev. denied (Oct. 20, 1992).   The present case is distinguishable because Plaintiffs do not allege that Plaintiffs received the alleged misrepresentation by Defendants prior to making their investment decision.  Plaintiffs' argument that they later received a written prospectus that was based upon the misrepresentations also fails because Plaintiffs concede they made their investment decisions based upon oral representations made by MSF before ever receiving the written prospectus.  (Id. ¶¶ 23-25, 49.)  Plaintiffs claim they relied on "MSF's implicit representation, by underwriting the Debentures, that no material negative or adverse information about UHI existed and that the Debentures were a meritorious investment."  (Compl. ¶ 435 (emphasis added.))  This claim and Plaintiffs' other theories of reliance are too tenuous to support the reliance element of common-law fraud.  Having failed to allege legally sufficient factual allegations to show reliance, Plaintiffs' claim does not state a basis upon which relief may be granted.

**THEREFORE, IT IS HEREBY RECOMMENDED that:**

1.      Defendants' Motion to Dismiss and/or Strike (Doc. No. 33) be

**GRANTED**; and

2.      All of Plaintiffs' claims be **DISMISSED**.


Dated: July 27, 2006

      s/ Susan Richard Nelson
      SUSAN RICHARD NELSON
      United States Magistrate Judge


Under District of Minnesota Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by August 11, 2006 a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.